ROGER T. NUTTALL #42500
NUTTALL COLEMAN & WILSON
2445 Capitol Street, Suite 150
FRESNO, CA 93721
PHONE (559) 233-2900
FAX (559) 485-3852

ATTORNEYS FOR Defendant,
ALBERT LEWIS ELLIS

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

* * * * * * * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 1:10-CR-00266 |
| Plaintiff, | **SENTENCING MEMORANDUM** |
| vs. | Date: May 20, 2011 |
| ALBERT LEWIS ELLIS, | Time: 10:15 a.m. |
| Defendant. | Judge: Hon. Lawrence J. O'Neill |

TO: THE HONORABLE LAWRENCE J. O'NEILL, UNITED STATES DISTRICT COURT JUDGE AND TO THE UNITED STATES ATTORNEY'S OFFICE, BY AND THROUGH ITS REPRESENTATIVE MICHELE L. THIELHORN, ASSISTANT UNITED STATES ATTORNEY, AND SENIOR UNITED STATES PROBATION OFFICER ROBYN A. MAROOTIAN:

When ALBERT LEWIS ELLIS was initially confronted by law enforcement, several years ago, concerning the matters attendant to the indictment in this case, he accepted responsibility, and through counsel, he made it clear that he would cooperate with law enforcement in terms of discussing the circumstances surrounding the transgressions set forth in the indictment.

Mr. Ellis remained willing to engage in a cooperative effort, whereby ultimately, this did in fact occur by way of consultation with counsel, and where the Defendant and counsel met with members of the Secret Service, as well as the Office of the United States Attorney. Mr. Ellis proceeded to be debriefed over the course of several sessions with the government.

Neither counsel, nor Mr. Ellis, are of the position that the report and recommendation made by the United States Probation Office is, in any way, unfair.

There are, however, certain comments which need to be made to clarify the record. First, with reference to paragraph 21, and as a factual matter, Albert Ellis had no involvement with the 6058 North Del Mar property. That property was that of Mr. Ellis' exwife, Janine Nkosi. Additionally, Mr. Ellis had no connection with the financial dealings as related to 5598 West Menlo, the property at 10669 North Lochmoor, or the 3257 East Via Monte Verde property. These transactions relate only to Wrenl Burge.

The circumstances of Albert Ellis' involvement in the instant case commenced several years ago when he met Wrenl Burge at a family reunion in 2004. At that time, Albert Ellis found out that Wrenl Burge was his cousin. Wrenl explained to him that he was a real estate investor and that he had access to several properties. Mr. Ellis advised him that he was looking for a house to rent because his grandmother was moving to Fresno to live with him. They arranged for the rental of a house, but as the move-in date approached, Wrenl asked him if he was interested in purchasing the house on Cromwell. Mr. Ellis advised him that

his credit was not good enough to buy a house due to existing judgments regarding back child support. Mr. Ellis was advised that he could "clean up" his credit for a fee of $2,500.00. Mr. Ellis was advised that if he purchased the house on Cromwell, Wrenl would pay all of the closing costs and that the mortgage payment would be $3,200.00 per month.

Mr. Ellis told his friend Richard Hanna about the opportunity to "clean up" his credit as well, and pursuant to Wrenl's instructions to go to City Bank and deposit the necessary amount of money into a particular account. The amount of $5,000.00 was deposited on behalf of both Albert Ellis and Richard Hanna. The net result of this was the existence of newly issued social security numbers with the attendant "good credit".

In November of 2004, Mr. Ellis purchased the Cromwell house as agreed upon, and whereby Wrenl Burge handled all the paperwork, through another third party, relating to the mortgage company, loan documents and appraisal, etc. Mr. Ellis was also asked by Wrenl if he was interested in purchasing a second home. He was told that such a purchase could also be accommodated. At that time, however, Mr. Ellis could not foresee a reason to purchase a second home.

Shortly after moving into Cromwell, Mr. Ellis became unhappy since the Cromwell house created a good deal of inconvenience for him, as well as his for grandmother. It was located far from her doctors and far from Mr. Ellis' business. Mr. Ellis asked his exwife Janine if she was interested in moving into the house. She was, and she took over the obligation of paying the mortgage.

The house on Antioch was presented to Albert Ellis by another relator. This did not involve Wrenl Burge. Mr. Ellis did, however, contact the same party utilized respecting Cromwell to process the loan as related to the home on Antioch. Mr. Ellis was advised by this party to simply have the real estate agent draw up the paperwork and send it to her, whereby she would handle the rest of the transaction.

Mr. Ellis and his grandmother moved into the Antioch property of February of 2005. The mortgage payments were $3,500.00 per month, but after two years, the mortgage payments increased to $5,200.00 per month. As a result, based upon the declining economy and difficult times in business, Albert Ellis asked Richard Hanna to purchase the Antioch home from him so that the mortgage payments could be reduced such that Albert Ellis could keep the home. Here again Mr. Ellis contacted the same third party for loan processing, etc., whereby this party handled all of the paperwork, and where Albert Ellis, ultimately, signed the loan documents on Richard Hanna's behalf. Albert Ellis continued to make the reduced mortgage payments, and he and his grandmother lived on Antioch until approximately July of 2008 when the house was foreclosed upon due to his inability to keep up the payments.

With respect to homes on Paula, it was in January or February of 2005, that Wrenl Burge approached Mr. Ellis and reported that he was in jeopardy of losing two of his rental properties at the Paula street addresses. Wrenl explained that there was a sense of urgency involved, and that he needed someone to purchase the homes immediately. Mr. Ellis was concerned about

doing this. He was assured, however, that if he purchased the homes, Wrenl would have someone turn around and purchase them back from him within a month or so. Mr. Ellis did not profit from these transactions. He did, however, benefit because of the fact that Wrenl was able to then repay a portion of a debt owed to Mr. Ellis. Wrenl Burge profited approximately $12,000.00, and because the house was in Mr. Ellis' name, Mr. Ellis was expected to keep the money as a partial payment against a $30,000.00 loan which Mr. Ellis had previously made to Wrenl in 2006. In the end, with respect to the Paula properties, Mr. Ellis paid two mortgage payments for the homes, whereby he was assured that he would be paid back, but he was not.

In the end, the above scenario represents a series of unfortunate actions and circumstances for which Albert Ellis bears true regret and remorse under all of the circumstances.

In this latter regard, as well as with reference to the prospect of sentencing, attached please find a letter dated May 16, 2011, directed to the Court from Mr. Ellis. In addition, attached please find a letter dated March 15, 2011, which was prepared by Janine Nkosi, his exwife, in anticipation of the eventual prospect of sentencing before the Court.

In the final analysis, Albert Ellis now finds himself before the Court for judgment. He understands that reasonable and suitable punishment shall be levied as related to his transgressions, and he is ready and able to accept the Court's discretion in handing down a just sentence given all of the circumstances.

///

Respectfully submitted.

DATED: May 17, 2011.

                                        NUTTALL COLEMAN & WILSON

                                        By:  /s/ Roger T. Nuttall
                                               ROGER T. NUTTALL
                                               Attorneys for Defendant
                                               ALBERT LEWIS ELLIS

NUTTALL COLEMAN & WILSON
2333 MERCED STREET, SUITE 101
FRESNO, CALIFORNIA 93721
PHONE (559) 233-2900

May 16, 2011

The Honorable Lawrence J. O'Neil,
Judge, United States District Court
2500 Tulare Street, Suite 4401
Fresno, CA 93721

Dear Judge O'Neil,

Over the past several months I have spent a great deal of time reflecting over my life ad the current situation that I find myself. I have given a lot of thought about the words I would share with the court to explain myself. What I have come to realize I that there are few words to describe the incredible remorse that I have for my actions.

When I thing about how my behavior will impact my children, grandmother, and the other victims (unrelated to me) I feel intense remorse for my actions. I realize that as a result of my behavior, my children will not have their father. When I think about the embarrassment that they will experience when telling their friends that their father is in prison, I am deeply saddened. I have been the sole caretaker for my grandmother and we have had a very close relationship.

I would also like to say that I am terribly sorry for the anguish that I have caused to all the victims in this case. I do not know who they are personally but I do know that they do not deserve to suffer any harm as a result of my actions.

I have recently begun the process of getting my personal responsibilities in order. The reason I have waited is not for selfish reasons. I did not want to disrupt my children's and grandmother's lives. My children are very smart and focused in school, both of them in honors programs, they are active in sports and are involved in campus activities. I have not spoken to them about what is going on because I did not want to disrupt their lives. I know this experience will cause a great deal of emotional stress for them. My exwife and I are planning to arrange for them to meet with a counselor to help them make sense of everything.

As I have stated previously, my grandmother was in poor health and I did not want to cause her any additional stress by sharing with her what was going on. I knew that she would worry about me and that she would be very sad to move away. I wanted to protect her as much as possible. I honestly believed that it was in her best interest for me to wait. I wanted to everything that I could to spare my grandmother and to make the transition of her care such that it was not unduly unpleasant for her. As God might have it, my grandmother passed away this past Thursday, May 13, 2011, as a result of her seriously deteriorating medical condition.

This experience haw made me think long and hard about the importance of following the laws established by our society. I understand that rules are put in place to keep order in society and laws have been established to protect members of society from individuals who would cause harm to them, even if they do not intend to. It was never my intention to cause harm to anyone, but I do know that my behavior and the decisions I have made are wrong and have caused

anguish to many people. I accept full responsibility for my actions and I am prepared to pay the consequences.

Lately I have been thinking about the different paths that I have taken at various points in my life. Some paths have led to joyous experiences (birth of my children) and others have led to grief and hardship. When the time comes for me to put all of this behind me, I will definitely dedicate my life to working with young adults who are heading down the wrong path. If my journey can in someway steer others down a different, more productive road, I will do what I can to help them get there. I will also spend the rest of my life working hard to become a positive role model for my children. The most difficult thing for me to deal with is the fact that I have let my children down. I know that actions speak louder than words, so if I can get involved in any programs when I am gone to begin my journey toward leading a better life I will certainly do what I need to do to get involved in them.

I would like to thank the court in advance for providing me sufficient time to take care of my personal obligations. I would also like to thank the prosecutors and investigators for the level of respect they showed my grandmother and me when they arrived to my home to question me. Finally, I would like to say that if I could undo my actions and head down a different path I would do so without hesitation, not because of how this entire experience has affected me but because I am truly sorry for how my actions have impacted others.

Sincerely,


Albert Ellis

March 15, 2011

To the Honorable Judge:

My name is Janine Nkosi and I reside in Fresno, CA with my husband and two children. I am employed at Fresno City College as an academic counselor and coordinator of the Online Tutoring and Extending The Class (ETC) programs.

I have had the pleasure of knowing Albert Ellis for over 15 years. During the years of our acquaintance, I have known Mr. Ellis in many capacities. He is my ex-husband, former business partner, father of my two children, friend and confidant. Shortly after our separation, Mr. Ellis and I sought counseling to work through the challenges of our divorce. Our goal was to establish a solid parental relationship to provide for our two young children. Over the years, the respect and admiration that we had for each other as parents grew into a unique friendship that has inspired other divorced couples to work through their own challenges.

I have also known Mr. Ellis in the capacity of caretaker to his 85 year-old widowed grandmother. I believe this role speaks volumes about the type of character Mr. Ellis possesses. His grandmother came to live with him after experiencing heart failure in 2003. Two years later her husband died. His responsibilities in this capacity have significantly increased in the past few years with the steady decline in her mental and physical capabilities. Mr. Ellis provides all of her daily care such as bathing, feeding, administering medication and spending quality time with her. He is also her medical advocate as he takes her to all of her physician appointments and ensures that she is receiving quality medical care.

In 1997 Mr. Ellis established a local business and has supported many community events such as sponsoring local youth sports programs. He has also volunteered his time coaching and providing financial contributions to his children's school. Mr. Ellis coached his sons 4th, 5th, and 6th grade basketball team and became a strong advocate for student success on and off the court. In addition, Mr. Ellis and I have partnered to advocate for victims of family abuse and spread awareness through guest speaking engagements. Biannually we speak to graduate students in the Counseling program at Fresno State. The professors at Fresno State have shared with us that the students we encounter gain new perspectives on the impact that counseling can have on victims and perpetrators of domestic violence.

In summary, I have known Mr. Ellis to be a dependable, conscientious, hardworking and caring person. I know that Mr. Ellis wishes more than anything to be able to continue to provide love and support to his grandmother and children.

If you have any questions or require any further information, please contact me at (559) 960-9450.

Sincerely,

Janine Nkosi